Maria S. Bellafronto, Bar No. 161994
mbellafronto@hopkinscarley.com
Aleksandr Korzh, Bar No. 286613
akorzh@hopkinscarley.com
HOPKINS & CARLEY
A Law Corporation
The Letitia Building
70 S. First Street
San Jose, CA 95113-2406

***mailing address:***
P.O. Box 1469
San Jose, CA 95109-1469
Telephone: (408) 286-9800
Facsimile: (408) 998-4790

Attorney for Plaintiffs SOUTH DAKOTA TRUST COMPANY as Trustee of the Donna Wills 2014 Irrevocable Trust, and DONNA M. WILLS, an individual

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTH DAKOTA TRUST COMPANY, Trustee of the Donna Wills 2014 Irrevocable Trust, and DONNA M. WILLS, an individual,<br><br>Plaintiffs<br><br>v.<br><br>AMERICAN GENERAL LIFE INSURANCE COMPANY,<br><br>Defendant. | Case No. CV 13 05860 EJD<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT AMERICAN GENERAL LIFE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE: December 3, 2015<br>TIME: 9:00 a.m.<br>COURTROOM: Courtroom 4, 5th Floor<br>JUDGE: Edward J. Davila |

## TABLE OF CONTENTS

Page


I. INTRODUCTION ........ 1

II. STATEMENT OF RELEVANT FACTS ........ 1

A. Donna Wills And Her Husband, Richard Wills, Set Up A Financial And Estate Plan That Included An American General Life Insurance Policy ........ 1

1. Cash Value – Life Benefit ........ 2

2. Death Benefit ........ 3

B. In February 2008, Thornhill, While Serving As The Servicing Agent Of The Wills' Policy, Became The Trustee Of The Plan Which Owned The Policy ........ 3

C. Less Than A Year Before The Misappropriation Of Funds, American General Terminated Thornhill's Agency Appointment For Cause ........ 4

D. Using His Power As Trustee Of The Plan, Thornhill Misappropriated Approximately $1.4 Million From The Cash Value Of The Wills' Policy ........ 4

E. The Fraudulent Loans Continue To Endanger The Viability Of The Policy And The Value Of The Death Benefit ........ 5

F. In 2014, The Policy Was Transferred From The Wills Welfare Benefit Plan To Donna Wills, Individually, Before She Transferred It To Her Trust ........ 5

G. Donna Wills Is The Only Person With The Ability To Replenish The Missing Funds And Prevent The Policy From Collapsing ........ 5

H. Plaintiffs' Allegations Regarding Duty Are Set Forth In Paragraph 38 Of The Second Amended Complain ("SAC") ........ 6

I. Facts Supporting Plaintiffs' Allegations That American General Breached Its Duty To Plaintiff ........ 6

1. American General Has An Express Policy Forbidding Its Agents From Concurrently Serving As Trustees Of Their Customers' Trusts Owning Policies Because It Creates A Conflict Of Interest ........ 7

2. American General Does Not Enforce Its Own Polices To Ensure Its Appointed Agents Comply With Its Compliance Manuals, Including The Rule Forbidding Its Agents To Serve As Trustees ........ 7

3. For Over Two Years After Thornhill's Termination, American General Continued To Represent That Thornhill Was The Servicing Agent Under The Policy ........ 8

4. Before His Termination, Thornhill Was Involved In Prior Litigation Involving Allegations Of Fraud And/Or Breach Of Fiduciary Duty While Serving As American General's Agent ........ 9

III. ARGUMENT ........ 9

A. Legal Standard For Summary Judgment ........ 9

B. Donna Wills Has Standing As A Matter Of Law Because She Was And Continues To Be Harmed By The Misappropriation Of Funds From The Policy That Has Placed The Continued Viability Of The Policy In Danger ........ 10

C. Donna Has Standing To Assert Her Claim For Financial Elder Abuse ........ 11

**TABLE OF CONTENTS**
**(continued)**

**Page**

1. This Court Should Interpret Elder Abuse Standing Based On Substantive California Law .......... 12
2. The Legislature Enacted EADACPA To Protect Victims Like Donna Through The Use Of Civil Suits .......... 13
3. The Legislature Amended EADACPA So That An Elder Can Sue For Harm Which Will Not Fully Consummate Until After Death .......... 14

D. American General Breached The Implied Covenant Of Good Faith And Fair Dealing .......... 15

E. American General Owes A Duty To Plaintiffs To Act Reasonably Under The Circumstances .......... 16

1. This Court Has Already Determined That American General Owes Plaintiffs A Cognizable Duty .......... 16
2. American General Misconstrues The Duty Plaintiffs Allege It Owes To Them .......... 17
3. American General Owes A Duty To Use Ordinary And Reasonable Care To Prevent Injury To Plaintiffs .......... 19
   a. Foreseeability of Harm to SDTC .......... 20
   b. The Degree of Certainty that SDTC Suffered Injury and the Closeness of the Connection Between American General's Conduct and the Injury Suffered .......... 21
   c. The Moral Blame Attached to the Defendant's Conduct And The Policy Of Preventing Future Harm .......... 21
   d. The Extent Of The Burden To The Defendant And Consequences To The Community Of Imposing A Duty To Exercise Care With Resulting Liability For Breach .......... 22
   e. The Availability, Cost, And Prevalence Of Insurance For The Risk Involved .......... 23
4. American General Owes Duties Of Care Separate And Apart From State Laws And Regulations .......... 23

F. Plaintiffs' Aiding And Abetting Cause Of Action Is Viable .......... 24

G. Plaintiffs' Claim Under The UCL Is Viable .......... 24

IV. OBJECTIONS TO EVIDENCE .......... 25

V. CONCLUSION .......... 25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Allstate Ins. Co. v. Hughes*, 358 F.3d 570 (9th Cir. 2004) ... 13
*Asghari v. Volkswagon Grp. Of Am.*, Inc., 42 F. Supp. 3d 1306 (C.D. Cal. 2013) ... 25
*Baker v. Carr*, 369 U.S. 186 (1962) ... 10
*Ballard v. Uribe*, 41 Cal. 3d 564 (1986) ... 18
*Boorstein v. CBS Interactive, Inc.*, 222 Cal.App.4th 456 (2013) ... 13
*Bounds v. Sup. Ct.*, 229 Cal.App.4th 468 (2014) ... 14, 15
*Burlington Ins. Co. v. Oceanic Design & Constr., Inc.*, 383 F.3d 940 (9th Cir. 2004) ... 13
*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 317 (1986) ... 9
*Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163 (1999) ... 24
*Cent. Arizona Water Conservation Dist. v. U.S. E.P.A.*, 990 F.2d 1531 (9th Cir. 1993) ... 11
*Cent. Delta Water Agency v. United States*, 306 F.3d 938 (9th Cir. 2002) ... 10
*Chase v. Blue Cross of California*, 42 Cal.App.4th 1142 (1996) ... 23
*Clinton v. City of New York*, 524 U.S. 417 (1998) ... 10
*Dillon v. Legg*, 68 Cal 2d 728 (1968) ... 20
*Drake v. Pinkham*, 217 Cal.App.4th 400 (2013) ... 15
*Dutton v. Pacifica*, 35 Cal. App. 4th 1171 (1995) ... 20
*Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809 (1979) ... 16, 24
*Estate of Lowrie*, 118 Cal.App.4th 220 (2004) ... 13, 14
*Experian Information Solutions, Inc. v. Lifelock, Inc.*, 633 F. Supp. 2d 1104 (C.D. Cal. 2009) ... 24

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Gaitan v. Mortg. Elec. Registration Sys.*,
2009 WL 3244729 (C.D. Cal. Oct. 5 2009) ........ 18

*Hedlund v. Superior Court*,
34 Cal. 3d 695 (1983) ........ 20

*Hodel v. Irving*,
481 U.S. 704 (1987) ........ 15

*In re Alexander's Estate*,
149 Cal. 146 (1906) ........ 14

*In re Marriage of Edwards*,
38 Cal.App.4th 456 (1995) ........ 14

*Jackson v. Aetna Life & Casualty, Co.*,
93 Cal.App.3d 838 (1979) ........ 22

*Jolly v. Eli Lilly & Co.*,
44 Cal. 3d 1103 (1988) ........ 15

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (2003) ........ 24, 25

*Krottner v. Starbucks Corp.*,
628 F.3d 1139 (9th Cir. 2010) ........ 10

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S.Ct. 1348 (1986) ........ 9

*Mintz v. Blue Cross of California*,
172 Cal. App. 4th 1594 (2009) ........ 19

*Morris v. Choicepoint Servs., Inc.*,
No. C-06-1224 SC, 2006 WL 2479122 (N.D. Cal. Aug. 28, 2006) ........ 11

*Neff v. New York Life Ins. Co.*,
30 Cal. 2d 165 (1947) ........ 23

*Noveletsky v. Metro. Life Ins. Co.*,
No. 2:12-CV-00021-NT, 2013 WL 2945058 (D. Me. June 14, 2013) ........ 11

*Protocols, LLC v. Leavitt*,
549 F.3d 1294 (10th Cir. 2008) ........ 10

*Randi W. v. Muroc Joint Unified School Dist.*,
14 Cal. 4th 1066 (1997) ........ 18, 19

*Rowland v. Christian*,
69 Cal. 2d 108 (1968) ........ 19, 20

*Simon v. Eastern Kentucky Welfare Rights Organization*,
426 U.S. 26 (1976) ........ 10

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assn.*,
809 F.2d 626 (9th Cir. 1987) ........ 9

*Teselle v. McLoughlin*,
173 Cal.App.4th 156,(2009) ........ 12

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Ting v. United States*,
927 F.2d 1504 (9th Cir. 1991) .......... 10

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) .......... 10

*Vu v. Prudential Property & Casualty Ins. Co.*,
26 Cal. 4th 1142 (2001) .......... 17, 23

*Walker v. Countrywide Home Loans, Inc.*,
98 Cal.App.4th 1158 (2002) .......... 25

*White v. Southern Cal. Edison Co.*,
25 Cal. App. 4th 442 (1994) .......... 20

**Statutes**

Business and Professions Code section 17200 *et seq.* .......... 24, 25

California Code of Civil Procedure section 367 .......... 13

California Welfare & Institutions Code section 15600(a) .......... 13, 14, 15

California Welfare & Institutions Code section 15610.30 .......... 12

Civil Code section 1714 .......... 19

Civil Code section 1714(a) .......... 19

**Other Authorities**

Finberg, *Financial Abuse of the Elderly in California* (2003) 36 Loyola L.A. L.Rev. 667 .......... 14

Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1140 (2007-2008 Reg. Sess.) as amended
March 10, 2008, p. 4 .......... 14

**Rules**

Civil Local Rule 7-9 .......... 17, 24

Federal Rule of Civil Procedure 56 .......... 9

Federal Rule of Civil Procedure 56(c) .......... 9

Federal Rule of Evidence 403 .......... 25

Federal Rule of Evidence 404 .......... 25

Federal Rule of Evidence 405 .......... 25

Federal Rule of Evidence 802 .......... 25

Federal Rule of Evidence 402 .......... 25

## I. INTRODUCTION

American General's motion for summary judgment ("Motion") seeks to dispose of this case by recasting Plaintiffs' allegations of breach of duty as the actual duties to avoid the numerous, insurmountable factual disputes. In fact, American General thumbs its nose at the Court's Order Denying Defendant's Motion for Judgment on the Pleadings, dated September 23, 2014 ("JOP Order") by rearguing issues previously decided by the Court. The Court has already found that American General owes a cognizable duty to Plaintiffs, yet its Motion seeks a dismissal of the negligence claim for lack of duty.

Contrary to American General's assertion, Plaintiffs do not seek to create new duties upon insurance companies and cataclysmically change the insurance industry. They simply seek to hold American General liable for failing to use reasonable and ordinary care under the totality of the circumstances of this case to protect its policyholders from foreseeable risks of harm.

American General further asserts that only a trust company could have been harmed by the theft, ignoring that Donna Wills, a 78 year old widow, has always had an interest in what happens to the policy. California law protects victims like Ms. Wills. Ironically, American General seeks to blame Ms. Wills for Thornhill's transgressions throughout its motion. The reality is that Ms. Wills is inextricably linked to every aspect of this case and she has been harmed – she must replenish the stolen money to prevent catastrophic loss to the policy.

American General has a business model purportedly premised on ethical market conduct and ensuring that its policyholders are treated in a "fundamentally fair way." Yet, its motion, distilled to its essence, states that it owes no duty of reasonable care to its customers. This contention flies in the face of established California law and any notion of fundamental fairness. The motion should be denied.

## II. STATEMENT OF RELEVANT FACTS

### A. Donna Wills And Her Husband, Richard Wills, Set Up A Financial And Estate Plan That Included An American General Life Insurance Policy

In 1975, Donna and Richard Wills purchased D&H Manufacturing, a company specializing in high precision machined parts and mechanical assemblies. (Declaration of Donna M. Wills In

Support Of Plaintiffs' Opposition to American General's Motion For Summary Judgment ["Wills Decl."], ¶2). When they bought D&H Manufacturing, the company had only 5 employees. (*Id.*) Over the course of the next 30 years, Donna and Richard worked tirelessly to build and grow the business. (*Id.*) At one point, the company had over 275 employees. (*Id.*)

In 1997, Donna and her husband met Gary Thornhill ("Thornhill"). (Wills Decl. ¶3). Thornhill was a licensed insurance agent for defendant American General in or around 1997-1998. (Request for Judicial Notice In Support of Plaintiffs' Opposition to American General's Motion for Summary Judgment ["RJN"], Exhibit ["Exh."] 2, Answer of Defendant American General Life Insurance Company to Plaintiff's Second Amended Complaint ["Answer"], at ¶8). With Thornhill's assistance, Donna and Richard began developing and revising their financial and estate plan. (Wills Decl. ¶3). As part of the financial and estate planning process, Thornhill recommended and sold them American General Policy #A70001695L (insuring the lives of Richard and Donna Wills with a death benefit of $15,400,000, as well as a cash value component) (the "Policy"). (Wills Decl. ¶3, Exh. A [Policy]; RJN, Exh. 3, Updated Joint Case Management Conference Statement ["CMC Statement"], §15, p. 6). The Policy issued on or about April 21, 1998. (*See id.)*

The owner of the Policy in 1998 was the ECI Plan, and Colonial Trust Company (and later, Republic Bank) was the trustee. (RJN, Exh. 3 [CMC Statement], §15, p. 6; Wills Decl., ¶4). In or around the mid-2000s, after many decades growing D&H Manufacturing, Richard and Donna Wills decided to sell the company due to Richard Wills' serious health issues. (Wills Decl., ¶4). Around this time, at Thornhill's recommendation, the Wills formed a new entity called Wills Management, LLC Employee Welfare Benefit Plan (the "Wills Welfare Benefit Plan"). (*Id.*) The Policy was then transferred from the ECI Plan to the Wills Welfare Benefit Plan. (*Id.*)

**1. Cash Value – Life Benefit**

The Cash Value, initially funded by three annual premium payments of $1 million sustains the $15.4 million death benefit pursuant to the terms of the Policy. (*See* Wills Decl., Exh. A [Policy]). As explained more fully below, the amount of money in the Cash Value is critical to the viability of the death benefit under the Wills' Policy.

Under the Plan, Donna Wills received "Life Benefits" under the Plan whereby she could draw against the Cash Value for any unreimbursed medical expenses she incurred during her lifetime. (Declaration of Maria S. Bellafronto in Support of Plaintiff's Opposition to American General Life Insurance Company's Motion for Summary Judgment ["Bellafronto Decl."], Exh. E, Exh. M at AGL/WILLS MORGAN STANLEY 3RD PARTY 000206, 209-210). Such claims for medical reimbursement were characterized as "loans" against the Cash Value under the Policy. Ms. Wills submitted claims for reimbursement of her medical expenses on several occasions between 2008 and 2010 in amounts ranging from $7,500 to $10,000. (Bellafronto Decl., Exh. A, Exh. H at AGL/WILLS002483).

#### 2. Death Benefit

The Policy also provides for a death benefit in the amount of $15.4 million (the "Death Benefit"). (RJN, Exh. 2 [Answer] at ¶9). Richard Wills passed away on September 27, 2005 leaving Donna as the sole insured under the Policy. (Wills Decl., ¶5; RJN, Exh. 2 [Answer] at ¶11).

The Policy owner is permitted to take loans against the Policy, however, if the total amount of the outstanding loans ever exceeds the Cash Value of the Policy, the Policy will lapse unless the loans are repaid or additional premiums are paid into the Policy. (*See* Wills Decl., Exh. A [Policy] at pp. 13 and 15). Similarly, the Policy also lapses if the Cash Surrender Value (Cash Value less any outstanding loans) on the day maintenance fees are due is not sufficient to pay for the fees due. (*Id*. at p. 13). If the Policy lapses and is not restored during the permitted grace period, the death benefit is permanently lost. (*See id*.)

### B. In February 2008, Thornhill, While Serving As The Servicing Agent Of The Wills' Policy, Became The Trustee Of The Plan Which Owned The Policy

In or around 2008, Thornhill suggested that he be appointed trustee of the Welfare Benefit Plan in place of Republic Bank. (Wills Decl., ¶6, Exh. B). Based on his suggestion, Thornhill replaced Republic Bank as trustee of the Wills Welfare Benefit Plan. (*Id*., RJN, Exh. 2 [Answer] at ¶14, Exh. 3 [CMC Statement],at ¶15, p.7). Specifically, in approximately May 2008, Thornhill submitted a "Change of Trustee" form to American General demonstrating that he was becoming

the newly appointed trustee for one of American General's customer's trust which owned one of its policies. (Wills Decl. at ¶6, Exh. B). Notably, these forms do not notify or warn the policyholders or trustors of American General's rule that agents are prohibited from serving as trustees.

### C. Less Than A Year Before The Misappropriation Of Funds, American General Terminated Thornhill's Agency Appointment For Cause

In February 2010, American General learned that Thornhill was steadily replacing American General insurance policies to the company's detriment, meaning that he was encouraging American General's customers to replace its policies with non-American General policies. (Bellafronto Decl., Exh. B [Sexton Depo.], at 39:2-40:2, 61:16-64:3; Exh. I). In addition, Thornhill was making false and harmful statements about the company to high level producers at company conventions. (*Id*.). In the words of Glenn Plotkin, American General's Vice President of Marketing for Advanced Markets, Mr. Thornhill's conduct was apparently so intolerable that there was "no chance that Gary and the company will reconcile differences, so perhaps consideration should be given to terminating his contract as soon as possible." (Bellafronto Decl., Exh. I). American General had asked Thornhill to cease and desist from disparaging the company in the past, but it became clear to American General that he would not stop his behavior, so they decided to terminate him. (Bellafronto Decl., Exh. B [Sexton Depo.], 45:3-11).

### D. Using His Power As Trustee Of The Plan, Thornhill Misappropriated Approximately $1.4 Million From The Cash Value Of The Wills' Policy

After Thornhill was allowed to become trustee of the Plan while, at the same time, remaining the servicing agent for the Policy (in direct violation of American General's policy), and after his agency appointment was terminated by American General (for dishonesty), on January 28, 2011, he stole $591,178 from the Cash Value of Donna Wills' Policy. (RJN, Exh. 4, ["Confession of Judgment"] p. 3:10-14; RJN, Exh. 3 [CMC Statement], §15, p. 7). Nine months later, on October 27, 2011, Thornhill was able to steal another $818,066 from the Cash Value. (*Id*.) In total, Thornhill misappropriated approximately $1.4 million in "loans" from the Wills'

Policy for his own personal use and benefit (together, the "Fraudulent Loans"). (*Id.*) The Fraudulent Loans continue to accrue interest until they are repaid. (RJN, Exh. 2 [Answer] at ¶32). Although Thornhill admitted his wrongdoing and Donna Wills obtained a Confession of Judgment against him, the funds have not been replenished. (*Id.*)

**E. The Fraudulent Loans Continue To Endanger The Viability Of The Policy And The Value Of The Death Benefit**

The Fraudulent Loans have decreased the length of time that the Policy will remain viable. (Weber Decl. ¶5; Bellafronto Decl., Exh. E, Exh. F). Had the Fraudulent Loans not been made, the Policy would last years longer before lapsing. (*Id.*). In addition, the Fraudulent Loans continue to accrue interest. (RJN, Exh. 2 [Answer] at ¶32). If the Fraudulent Loans are not repaid before Mrs. Wills dies, they will be repaid out of the Death Benefit, with interest. (Weber Decl. ¶7). Therefore, as long as the Fraudulent Loans remain unpaid, they effectively continue to decrease the value of the Death Benefit.

**F. In 2014, The Policy Was Transferred From The Wills Welfare Benefit Plan To Donna Wills, Individually, Before She Transferred It To Her Trust**

In 2014, based on the advice of Donna Wills' financial advisors, ownership of the Policy was transferred from the Wills Welfare Benefit Plan to Donna Wills, individually. (Wills Decl., ¶8, Ex. C). The transfer resulted in an additional significant tax liability that Ms. Wills had to pay. (Wills Decl., ¶8). Ms. Wills then sold the Policy to the Donna Wills 2014 Irrevocable Trust dated May 7, 2014 ("Wills 2014 Trust") under a written purchase and sale agreement in exchange for a promissory note for $3,284,509.00. (Wills Decl., ¶8, Exh. D and Exh. E).

**G. Donna Wills Is The Only Person With The Ability To Replenish The Missing Funds And Prevent The Policy From Collapsing**

The Wills 2014 Trust does not have sufficient assets that can be used to repay the Fraudulent Loans currently outstanding on the Policy. (Wills Decl., ¶10). There are no other persons or entities currently able and willing to repay the Fraudulent Loans. (*Id.*) As a result, in order to stop the accrual of interest and risk of premature lapse of the Policy, Donna Wills is the only person in the position to repay the Fraudulent Loans. Moreover, if the Policy prematurely

lapses, the death benefit will not be paid. (*Id.*) If this occurs, there will not be sufficient funds to repay the promissory note for $3,284,509.00 owed by the Wills 2014 Trust.

### H. Plaintiffs' Allegations Regarding Duty Are Set Forth In Paragraph 38 Of The Second Amended Complain ("SAC")

Paragraph 38 of the SAC expressly sets forth the duty Plaintiffs allege American General owes:

> 38. Defendant owed a **duty of care to Plaintiffs to use reasonable skill, care and prudence to properly manage, hold and/or otherwise oversee and protect Donna Wills' benefits under her Policy**, including the funds held in her Cash Value, which duties including exercising due diligence and investigation of suspicious activity when there is a foreseeable risk of harm to the benefits afforded to Donna Wills under her Policy.

(RJN, Exh. 1 [SAC], emphasis added).

Similarly, the Updated CMC Statement expressly states in Section 3(A), labeled "Duty":

> Plaintiffs anticipate that Defendant will argue that it owed no legal duty of care toward Plaintiffs. Plaintiffs maintain, however, that Defendant, as Plaintiffs' insurer, had a special relationship with Plaintiffs and owed Plaintiffs **a duty to use reasonable skill, care and prudence to properly manage, hold and/or otherwise oversee Plaintiffs' benefits under the policy**, including the funds held in her cash reserve. Furthermore, Defendants owed Plaintiffs a duty of good faith and fair dealing. Plaintiffs also contend that special circumstances exist in this case giving right to a duty to protect Plaintiffs from Thornhill's foreseeable breaches of fiduciary duty, fraud and m misappropriation.

(RJN, Exh. 3 [Updated CMC Statement], emphasis added).

### I. Facts Supporting Plaintiffs' Allegations That American General Breached Its Duty To Plaintiff

Paragraph 39 of the SAC, which American General incorrectly characterizes as the allegations of <u>duty</u>, actually sets forth the allegations regarding <u>breach:</u> "39. Defendant breached its duty by, among other things…" (RJN, Exh. 1 at ¶39 [SAC]). In other words, Plaintiffs allege in paragraph 39 that under the totality of circumstances, American General breached its duty of ordinary and reasonable care as a result of the combined effect of all of its actions and inactions. Examples of American General's conduct that, together, constitute breach are discussed below.

**1. American General Has An Express Policy Forbidding Its Agents From Concurrently Serving As Trustees Of Their Customers' Trusts Owning Policies Because It Creates A Conflict Of Interest**

American General acknowledges that allowing its agents to serve as trustees of trusts that are the owners or beneficiaries of policies creates a conflict of interest. (Bellafronto Decl., Exh. B [Sexton Depo.], at 84:10-85:7, Exh. C, Deposition Testimony of Jay Lohman ["Lohman Depo."], Exh. J at AGL/WILLS 2600). In fact, in 2009, before Thornhill's agency appointment was terminated by American General, the insurance company had an explicit policy forbidding its agents from concurrently serving as trustees. (*Id*.). In fact, American General requires that its agents avoid even perceived conflicts of interest at all times. (*Id*., Exh. K at AGL/WILLS 2576).

These policies of avoiding conflicts of interest in dealing with American General's customers and prohibiting its agents from concurrently serving as trustees of trusts owned by its policyholders are consistent with the "Ethical Market Conduct" principles which American General adopted from the Insurance Marketplace Standards Association ("IMSA"). For example, American General has committed to treating its customers fairly and conducting its business according to high standards of honesty and fairness. (*Id*., Exh. C [Lohman Depo.] at 112:14-25, Exh. J at AGL/WILLS 2494, Exh. K at AGL/WILLS 2576).

The testimony of American General's Senior Vice President and Chief Distribution Officer, Durr Sexton, confirmed that "yes, I see a lot of problems with it, with someone being a trustee and also an agent" and "there's a conflict of interest." (*Id*., Exh. B [Sexton Depo.], at 17:13-21, 84:10-85:7, emphasis added). In addition, American General's Vice President of Licensing and Compensation, Jay Lohman, testified similarly that American General's agents are prohibited from concurrently serving as trustees of trusts owning policies. (*Id*., Exh. C [Lohman Depo.], at 127:20-128:9).

**2. American General Does Not Enforce Its Own Polices To Ensure Its Appointed Agents Comply With Its Compliance Manuals, Including The Rule Forbidding Its Agents To Serve As Trustees**

When asked whether American General had any policies or procedures in place to proactively prevent a breach of its conflict of interest policy, one of American General's vice presidents testified that to his knowledge, American General has no procedure for monitoring its

appointed agents to ensure they comply with this policy aimed at preventing conflicts of interest. (*Id.*, at 156:16-157:24). Other than verifying that its agents are properly licensed by the state at all times and given a copy of its manual, American General takes no steps to ensure that its agents are following its company rules, particularly regarding avoiding conflicts of interest. Rather, as American General's insurance expert, Neal T. Gooch, admitted, the company hands out its compliance manuals to its agents, does nothing to enforce the policies for 15-20 years, but waits until someone else brings a problem to their attention before enforcing its policies. (Bellafronto Decl., Exh. G Deposition Testimony of Neal T. Gooch ["Gooch Depo."], 72:20-73:1). To make matters worse, Mr. Gooch testified that the specific policy at issue in this action, prohibiting American General agents from concurrently serving as trustees, is designed to prevent fraud and even potential fraud. (*Id.*, at 50:3-12).

### 3. For Over Two Years After Thornhill's Termination, American General Continued To Represent That Thornhill Was The Servicing Agent Under The Policy

American General contends that if an agent is terminated by the company, he can no longer be the servicing agent under any policies. (*Id.*, Exh. C [Lohman Depo.], at 70:23-71:3). Nevertheless, American General continued to cloak Thornhill with agency status two years after his appointment was terminated by the company. Nobody at American General informed Thornhill's policyholders, including anyone on behalf of the Wills' Policy, that Thornhill's agency was terminated in 2010. (*Id.*, Decl., Exh. B [Sexton Depo.], at 53:3-6, 54:20-55:5).

Thus, it is undisputed that neither of the Plaintiffs in this case had any idea that Thornhill's status as the appointed servicing agent for the Wills' Policy had been terminated, let alone for dishonesty. In fact, American General represented precisely the opposite – that Thornhill was still the servicing agent for the Wills' Policy after his appointment was terminated, because American General continued to send letters addressed to Thornhill, as the trustee of the Wills' Policy, telling him to contact himself, Gary Thornhill, as the "servicing agent" for the Wills' Policy if he had any questions. (*Id.*, Exh. G [Gooch Depo], Exhibits N-Q, Exh. S).

#### 4. Before His Termination, Thornhill Was Involved In Prior Litigation Involving Allegations Of Fraud And/Or Breach Of Fiduciary Duty While Serving As American General's Agent

Over the past several years, both American General and Thornhill were named as defendants in multiple lawsuits involving claims of fraud and/or breach of fiduciary duty relating to Thornhill's role as an American General agent.[1] American General's knowledge of these lawsuits is one part of the totality of the circumstances in this case supporting Plaintiffs' contention that American General breached its duty of reasonable care.

## III. ARGUMENT

### A. Legal Standard For Summary Judgment

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact," the burden of production then shifts so that "the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial."' *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assn.*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 317 (1986)).

In evaluating evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. *See T.W. Electric*, 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348 (1986)); *Ting v. United States*, 927

---

[1] *William Dallas, et. al. v. American General Life Insurance Company, Gary Thornhill, et. al.*, CV759245; *Harry Brix, et. al. v. Gary Thornhill, et. al.*, CV777108; *Stephen Berry v. Indianapolis Life Insurance Co., et. al.*, 3:08-CV-0248-B; *Claude Young, et. al. v. Millennium Multiple Employer Welfare Benefit Plan, et. al.*, DC-08-13325; and *Daniel Laliberte, et. al. v. American General Life Insurance Company, et. al.*, CV09-03588. *See* RJN, Exh. 1 [SAC] at ¶¶ 16-27.

F.2d 1504, 1509 (9th Cir. 1991).

**B. Donna Wills Has Standing As A Matter Of Law Because She Was And Continues To Be Harmed By The Misappropriation Of Funds From The Policy That Has Placed The Continued Viability Of The Policy In Danger**

In order to conserve judicial resources, Plaintiffs incorporate their arguments and evidence set forth in support of their Motion for Partial Summary Judgment (Dkt. No. 77) ("MPSJ") by reference. American General argues that Donna Wills has no standing because she is not the owner of the Policy. However, Ms. Wills does have standing because she was and continues to be harmed as a result of the Fraudulent Loans taken out against the Policy.

"(T)he gist of the question of standing" is whether plaintiffs have "alleged such a personal stake in the outcome … as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends…" *Baker v. Carr*, 369 U.S. 186, 204 (1962). Notably, "standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982). When a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, "the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38 (1976).

Increased risk of likely harm establishes requisite injury-in-fact for standing purposes. *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1140 (9th Cir. 2010) (in negligence suit against employer, employees' allegation that theft of company laptop in which their personal information was stored subjected them to increased risk of future identity theft found sufficient to confer standing). A contingent liability also constitutes injury in fact where it has actual and imminent consequences. *See Clinton v. City of New York*, 524 U.S. 417, 431 (1998) ("a substantial contingent liability immediately and directly affects the borrowing power, financial strength, and fiscal planning of the potential obligor"); *Protocols, LLC v. Leavitt*, 549 F.3d 1294, 1299 (10th Cir. 2008). In addition, threatened injury constitutes "injury in fact." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947-48 (9th Cir. 2002). Finally, "sufficiently concrete and imminent" economic injury confers standing even if the precise amount of "economic harm is not

readily determinable." *Cent. Arizona Water Conservation Dist. v. U.S. E.P.A.*, 990 F.2d 1531, 1537-38 (9th Cir. 1993).

As set forth in Plaintiffs' MPSJ, American General cannot escape the fact that the Fraudulent Loans have placed the Policy at risk of prematurely lapsing and, even if the Policy does not lapse, interest continues to accrue on the Fraudulent Loans and will have to be paid out of the Death Benefit under the Policy. Ms. Wills is harmed by these facts in two ways: (1) if the Policy prematurely lapses, Ms. Wills' note will not be repaid as the current owner of the Policy has no other assets; and (2) Ms. Wills is the only person willing and able to repay the Fraudulent Loans to prevent further and potential future harm to the Policy. *See Noveletsky v. Metro. Life Ins. Co.*, No. 2:12-CV-00021-NT, 2013 WL 2945058, at *1 (D. Me. June 14, 2013) (holding that trustor has standing to assert cause of action for harm distinct from harm caused directly to the trust as a result of purchase of unsuitable life insurance policy). As a result, Ms. Wills has been and continues to be directly harmed as a result of the Fraudulent Loans and, therefore, she has standing to bring this action against American General.

American General's reliance on *Morris v. Choicepoint Servs., Inc.*, No. C-06-1224 SC, 2006 WL 2479122, at *3 (N.D. Cal. Aug. 28, 2006) is misplaced. In *Morris*, the court explained that with respect to property owned by a trust, only the trustee of the trust, "*not* the beneficiary, has legal title to the assets of a trust and is therefore the real party in interest" to bring suit for damage to trust property. The present case is plainly distinguishable. Under *Morris*, a beneficiary does not have standing, but the trustee does. Here, Ms. Wills is not arguing that she has standing as either a beneficiary or a trustee. Instead, Plaintiffs contend that Ms. Wills has standing based on her own *independent injury that she has suffered* as a result of American General's conduct as alleged in the SAC. Therefore, *Morris* is inapposite.

### C. Donna Has Standing To Assert Her Claim For Financial Elder Abuse

Similar to its arguments with respect to Article III standing, American General argues Ms. Wills has no standing because American General's conduct did not cause any harm to her,

only the Policy. (Motion, 13:21-15:15.)[2] As an initial matter, Plaintiffs note there are two periods relevant to a standing analysis. The first period is when Thornhill took the money (with American General's assistance) and Donna filed suit. During this time, Donna, as an individual, had the right to reimbursement for certain medical expenses from the Cash Value of the Policy. No party disputes that the Fraudulent Loans against the Policy reduced the Plan's ability to pay Donna's medical expenses without lapsing the Policy. Therefore, elder abuse standing for the initial period is straightforward: Donna had the right to demand the Cash Value be made readily available for her medical expenses, and the Fraudulent Loans diminished this right. (See, *Teselle v. McLoughlin*, 173 Cal.App.4th 156, 174 (2009) [elder abuse occurs where "the elder had the right to have the property transferred or made readily available to the elder or his or her representative"].)

With respect to the second period, and as detailed in the Statement of Facts, in March, 2014, the ownership structure of the Policy changed. Specifically, Donna arranged to have the Policy transferred to herself as an individual, paid the tax consequences of that transfer, sold the Policy to SDTC (the trustee of the 2014 trust she created), and took back a note to be re-paid from the death-benefit proceeds.

Donna freely admits that, as a result of these transactions, she no longer has the present right to medical reimbursement. However, the transactions did not forfeit Donna's standing in this action; they merely shifted the basis of her standing.

**1. This Court Should Interpret Elder Abuse Standing Based On Substantive California Law**

When sitting in diversity jurisdiction, this Court determines whether a plaintiff is a real party in interest under substantive state law, and in the case of a statutory action, Federal Courts

---

[2] The Motion does not challenge the other elements of a financial elder abuse claim. That is, the Motion does not dispute that Ms. Wills is over 65 years old, that property was taken, that American General assisted with this taking, or that the taking was wrongful. (Compare, Welf. & Inst. Code §15610.30 [elements of financial elder abuse] with Motion, 13:21-15:15.) Thus, the sole question on this aspect of the Motion is whether, for elder abuse purposes, the Legislature intended for elders harmed in the manner Ms. Wills was harmed to be able to sue the persons who assisted with that harm. It did, for the reasons set forth in the legislative intent section below.

interpret statutes by attempting to determine how California courts would resolve the question. (*Allstate Ins. Co. v. Hughes*, 358 F.3d 570, 578 (9th Cir. 2004); *Burlington Ins. Co. v. Oceanic Design & Constr., Inc.*, 383 F.3d 940, 944 (9th Cir. 2004).) In California, "the prerequisites for standing to assert statutorily-based causes of action are determined by from the statutory language as well as the underlying legislative intent and purpose of the statute." (*Boorstein v. CBS Interactive, Inc.*, 222 Cal.App.4th 456, 466 (2013).)

Here, American General asserts that because Donna does not own the Policy, she suffered no harm. This argument – made without any citation to any California case analyzing standing under California's Elder Abuse and Dependent Adult Civil Protection Act ("EADACPA" or the "Act") – fundamentally misunderstands both the intent behind the Act and California courts' appropriately-broad construction of harm thereunder.

**2. The Legislature Enacted EADACPA To Protect Victims Like Donna Through The Use Of Civil Suits**

"The Legislature recognizes that elders and dependent adults may be subjected to abuse, neglect, or abandonment and that this state has a responsibility to protect these persons." (Cal. Welf. & Inst. Code §15600(a).) Consonant with this express declaration of intent, the California Court of Appeal pronounced: "Standing, for purposes of the Elder Abuse Act, must be analyzed in a manner that induces interested persons to report elder abuse *and to file lawsuits against elder abuse and neglect*. In this way, the victimized will be protected." *Estate of Lowrie*, 118 Cal.App.4th 220, 230 (2004) (emphasis supplied).

The *Lowrie* defendant, like American General, advanced an interpretation of the Act which would have left no one willing or able to pursue an elder abuse action against a person who had defrauded and manipulated an elder. The Court rejected such an "unduly restrictive interpretation leading to an unwarranted result." (*Ibid*.). More broadly, *Lowrie* demonstrates that at the intersection of trust and elder law standing must be given a particularly flexible application, because those persons with traditional standing under the California Code of Civil Procedure (i.e., real parties in interest under Section 367) are the very persons to whom "elders frequently relinquish control" and who "become the elder or dependent adult's trustee or executor and

primary beneficiary." *Id*., at 231 (citing Finberg, *Financial Abuse of the Elderly in California* (2003) 36 Loyola L.A. L.Rev. 667). The purpose behind the Act is to stop this abuse, and standing must be analyzed accordingly.

**3. The Legislature Amended EADACPA So That An Elder Can Sue For Harm Which Will Not Fully Consummate Until After Death**

In 2008, in response to political efforts by an alliance of senior advocacy groups, the Legislature again amended the Act to make it easier for persons to file lawsuits to protect against financial elder abuse by eliminating the bad faith language and expanding the definition of financial elder abuse to include takings in which the elder "is deprived of any property right by means of an agreement, donative transfer, or testamentary bequest." A letter from the Senate Judiciary Committee discussing existing law and the impact of the new language clarifies that a prohibited taking occurs, under the new enactment, when a family member pressures an elder to "change the terms of a will". (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1140 (2007-2008 Reg. Sess.) as amended March 10, 2008, p. 4.) The long-settled rule that a will is not operative until after the elder dies,[3] coupled with the specific invocation of the over-pressured will scenario in the legislative history, demonstrates that the Legislature intended to include within the Act's ambit harm to the elder which will not be fully consummated until after the elder dies.

At least one published California Court of Appeal opinion interprets the new "agreement, donative transfer, or testamentary bequest" language to prohibit conduct which had not *yet* been fully consummated, but still constituted cognizable – and therefore actionable – harm to the elder. (*Bounds v. Sup. Ct.*, 229 Cal.App.4th 468 (2014).) In *Bounds*, developers over-pressured an elder into signing a letter of intent to transfer to them title to her property in exchange for a song. The elder sued, and defendants attempted to escape liability on the theory that, because the elder awoke to the scheme before she actually transferred title, their "taking" was unconsummated and therefore outside the bounds of the Act. The Court of Appeal disagreed with this "troubling"

[3] (See, *In re Alexander's Estate*, 149 Cal. 146, 149 (1906) ["with reference to its effect a will speaks from the death of the testatrix"]; *In re Marriage of Edwards*, 38 Cal.App.4th 456, 460 (1995) [breach of contract to make a will occurs at death because a will is revocable until death].)

interpretation, instead finding that the letter of intent, even without the actual transfer, sufficiently impacted the marketability of the property such that a "taking" occurred "by agreement". The Court reasoned that "in the context of [the Act], the phrases "donative transfer" and "testamentary bequest" refer both to transactions which have been performed … and to transactions that have not yet been performed (a promise to make a gift *and a testamentary bequest has been made but the testator has not died*.) (*Id*. at 482, emphasis added.)[4]

Here, the harm suffered by Donna closely resembles that suffered by the *Bounds* elder. Donna holds a note which, by its terms, is to be paid back out of the death-benefit of the Policy. (Wills Decl., ¶8, Exh. D and Exh. E.) Her interest under the note is assignable during her lifetime, and the value of this assignment – like the value of the property in *Bounds* – is negatively impacted by the abuse, because the loans both directly reduce the death benefit and increase the risk that the Policy lapses and all death benefits are forfeited. No matter that, like in *Bounds*, the most egregious harm (loss of the death benefit) has not yet occurred; the Legislature did not intend to force victims to wait until the worst has happened before bringing claims.[5] Donna may sue now because the marketability of her note has been damaged by virtue of American General's assisting with Thornhill's fraud – she has standing to seek redress.

**D. American General Breached The Implied Covenant Of Good Faith And Fair Dealing**

The law relating to the duty of good faith and fair dealing is well-established: the covenant

---

[4] The notion that a person has a cognizable, legally protectable interest in her post-death affairs is not an aberration of California law. (See, *Hodel v. Irving*, 481 U.S. 704, 715 (1987) [in determining whether certain escheat provisions constituted a "taking" under the U.S. Constitution, the United State Supreme Court was unequivocal: "there is no question, however, that the right to pass on valuable property to one's heirs *is itself* an important property right"] [emphasis supplied].) So, even without the take-back note paid from death-benefit proceeds, the Policy is an important part of Ms. Wills' estate plan because it allows her to cover the inheritance taxes which would otherwise diminish the valuable property she would like to pass to her heirs.

[5] Indeed, case-law applying California's limitation statutes and the doctrine of laches *strongly* counsels in favor of filing suit as soon as any appreciable harm is suffered, even where the harm is incomplete. See, *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 (1988) (statute of limitations begins to run as soon as plaintiff should have suspected "that someone has done something wrong to her"); *Drake v. Pinkham*, 217 Cal.App.4th 400 (2013) (applying laches to bar claim, as a matter of law, where plaintiff waits for decedent to die before pressing trust contest).

exists in all insurance contracts, its purpose is to prevent one side from frustrating the other side's right to benefit from the contract, and, crucially, "[f]or the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it again must give at least as much consideration to the latter's interests as it does its own." (*Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 818-819 (1979) [*en banc*].)

In typical fashion, the insurer resisting the ubiquitous covenant of good faith and fair dealing argues it did not violate the covenant by identifying certain clauses under which it was allowed to take action, stating forcefully that it did take those actions, and then blithely dismissing the catastrophic consequences of its *other* actions or inactions. (Motion, 15:16-16:24.) American General's lack of concern for the insured, the owner of the Policy, or anyone else, reaches an apogee when it states "American General did not prevent SDTC, as trustee for the 2014 Trust, from receiving Policy benefits." (*Id*. at 19-20.) SDTC received the benefits of the Policy? It is a life insurance policy. It pays benefits when the insured dies. Ms. Wills is alive. Of course SDTC has not received Policy benefits – only American General has, through the $3 million in premiums, not to mention the interest it is currently charging on the Fraudulent Loans.

By studiously avoiding the forest for the trees, American General seems not to understand that its assistance with Thornhill's takings threatens the only real benefit SDTC has in the bargain – the $15.4 million death benefit. Whether or not American General fulfilled its obligation by holding its palm out to collect premiums while sticking its head in the sand is "consider[ing SDTC's] interest as it does its own" will be a question the jury will decide. The $15.4 million death benefit is the benefit for which plaintiffs bargained (and American General concedes it is an express obligation under the Policy), American General's conduct has reduced that benefit and threatens to eliminate it entirely.

### E. American General Owes A Duty To Plaintiffs To Act Reasonably Under The Circumstances

#### 1. This Court Has Already Determined That American General Owes Plaintiffs A Cognizable Duty

American General fails to acknowledge that it has previously argued that it owed no duty to Plaintiffs in this case and that the Court rejected this argument. Specifically, in the Court's JOP

Order, the Court expressly stated: "Absent application of § 18100, the court rejects American General's argument that the negligence claim fails for lack of a cognizable duty." (RJN, Exh. 5 [JOP Order], p. 6, lines 16-18). Therefore, American General's renewed argument that it owed no duty to SDTC constitutes an improper motion for reconsideration and should be denied. *See* Civ. L.R. 7-9.

**2. American General Misconstrues The Duty Plaintiffs Allege It Owes To Them**

To the extent the Court considers American General's new argument that it owes no duty to SDTC, its motion should be denied, because its argument misses the mark. As the Court has already held in this case, American General certainly owes a duty of reasonable care to its policyholders. *See Vu v. Prudential Property & Casualty Ins. Co.*, 26 Cal. 4th 1142 (2001) (special relationship exists between insurer and insured).

In support of its Motion, American General incorrectly contends that Plaintiffs seek to create "new" law and impose three "novel" duties on an insurer that do not presently exist: "(1) an insurer's duty to investigate a change of trustee by a trust that owns a policy issued by an insurer; (2) an insurer's duty to investigate and/or question the validity of loans taken on a policy; and (3) a duty to warn a third party about the activities associated with a policy in which the third party has no direct or contingent interest." (Motion, p. 17, lines 7-14). However, American General cites to the wrong allegations in the SAC in support of this contention. American General claims that the duties Plaintiffs seek to impose are set forth in paragraph 39 of the SAC. But paragraph 39 does <u>not</u> allege the "duties" owed to Plaintiffs. That paragraph sets forth the facts establishing American General's <u>breach of duty</u>. American General completely ignores that the preceding paragraph 38 and the clear allegation of the duty owed from the October 3, 2014 Updated Joint Case Management Conference Statement: "Plaintiffs maintain, however, that Defendant, as Plaintiffs' insurer, had a special relationship with Plaintiffs and owed Plaintiffs a duty to use reasonable skill, care and prudence to properly manage, hold and/or otherwise oversee Plaintiffs' benefits under the policy, including the funds held in her cash reserve." (RJN, Exh. 1 [SAC], at ¶ 38, Exh. 3 [CMC Statement]).

In an attempt to avoid the numerous disputed issues of fact relating to American General's breaches of duty in this case, American General improperly recasts the breaches of duty in paragraph 39 of the SAC (i.e., failing to investigate a change of trustee, failing to investigate or question the validity of the loans, and failing to warn a third party about activities associated with the policy)[6] as the duties Plaintiffs seek to impose.[7] The duty owed in this case, however, is not so specific. Rather, it is a broader duty consistent with what the California Supreme Court requires the court to evaluate in terms of foreseeability of harm. *See, Randi W. v. Muroc Joint Unified School Dist.*, 14 Cal. 4th 1066 (1997) (holding "a court's task in determining 'duty' – is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party."). *Randi W., supra* at 1077, citing *Ballard v. Uribe*, 41 Cal. 3d 564, 572–73 at fn. 6 (1986).

Plaintiffs do not contend that American General has a duty relating to particular injuries in light of American General's specific conduct. Rather, Plaintiffs assert that American General owes a broader duty of reasonable and ordinary care to enact and enforce appropriate policies and procedures to prevent foreseeable harm to its policyholders. These are not novel legal duties or dramatic changes in the insurance industry. Plaintiffs seek only to hold American General to an ordinary and reasonable standard of care as set forth more fully below.

---

[6] The cases American General cites on page 20 of its Motion in support of its argument that it has no "duty to warn" (*Wayne Merritt Motor Co. v. New Hampshire Ins. Co., Rizzo v. State Farm Ins. Co.*, and *Thrivent Fin, for Lutherans v. Strojny*) are inapplicable because Plaintiffs do not contend that American General owed a specific duty to warn. Similarly, *Gaitan v. Mortg. Elec. Registration Sys.*, 2009 WL 3244729, at *9 (C.D. Cal. Oct. 5 2009), cited by American General for the proposition that lenders owe no duty to borrowers as a general rule is inapposite because (1) American General is not a traditional, mere money lender and (2) Plaintiffs are not asserting any duty arises out of its role in this regard; Plaintiffs assert that as an insurance company, American General owes a duty to act reasonably in order to protect its policyholders.

[7] The numerous questions that American General poses in footnotes 4 and 5 of its Motion demonstrate the various triable issues of fact surrounding the issue of whether American General breached its duty of reasonable care. Answers to some or all of these questions will be decided by the trier of fact. Those questions do not need to be answered to evaluate whether or not American General owes a duty to Plaintiffs.

### 3. American General Owes A Duty To Use Ordinary And Reasonable Care To Prevent Injury To Plaintiffs

Longstanding California Supreme Court decisions establish the fundamental rule that all persons have a duty to use ordinary care to prevent others from being injured as a result of their conduct. *Randi W. v. Muroc Joint Unified School District*, 14 Cal. 4th 1066, 1077 (1997), citing *Rowland v. Christian*, 69 Cal. 2d 108, 112 (1968) and Civil Code § 1714(a). This touchstone principle is codified in the California Civil Code: "Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself." Civil Code § 1714(a).

As stated in *Rowland v. Christian*, "although it is true that some exceptions have been made to the general principle that a person is liable for injuries caused by his failure to exercise reasonable care in the circumstances, it is clear that in the absence of statutory provision declaring an exception to the fundamental principle enunciated by section 1714 of the Civil Code, no such exception should be made unless clearly supported by public policy." *Rowland*, *supra*, at 112.

*Rowland* sets forth a number of factors that have been taken into account by courts in various contexts to determine whether a departure from the general rule is appropriate.[8] The court explained, "[a] departure from this fundamental principle involves the balancing of a number of considerations: the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the

---

[8] Although *Rowland* was decided in the premises liability context, the *Rowland* factors have been applied by courts in numerous other contexts to determine whether a party owes a duty. For example, in *Mintz v. Blue Cross of California*, 172 Cal. App. 4th 1594 (2009), the appellate court applied the *Rowland* factors to a case involve health insurance to conclude that the administrator of a health care plan owed a duty to plan members to exercise due care to protect them from physical injury caused by its negligence in making benefit determinations under the plan. *Mintz* at 1611. In addition, in the *Randi W. v. Muroc Joint Unified School Dist.* case, the state Supreme Court applied the *Rowland* factors to conclude that an employer had a duty of ordinary and reasonable care to prevent injuries to third parties.

community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." *Id.* at 113.

In short, "duty" is merely a conclusory expression used when the sum total of policy considerations lead a court to say that the particular plaintiff is entitled to protection. *Dillon v. Legg*, 68 Cal 2d 728, 734 (1968). Duty is an allocation of risk determined by balancing the foreseeability of harm, in light of all of the circumstances, against the burden to be imposed. *White v. Southern Cal. Edison Co.*, 25 Cal. App. 4th 442, 447 (1994). The existence of a duty must be decided by the court on a case-by-case basis. *Dutton v. Pacifica*, 35 Cal. App. 4th 1171, 1175 (1995).

Each of the *Rowland* factors weighs heavily in favor of American General having a duty of reasonable care to its policyholder SDTC.

**a. Foreseeability of Harm to SDTC**

Although foreseeability is most often a question of fact for the jury, when there is no room for a reasonable difference of opinion it may be decided as a matter of law. *Hedlund v. Superior Court*, 34 Cal. 3d 695, 705 (1983). This is such a case. It is highly foreseeable that an insurance company that fails to use reasonable skill, care and prudence to properly manage, hold and/or otherwise oversee and protect the benefits provided under its insurance policies will result in harm to the policyholders. That is precisely the duty owed by American General in this case. Therefore, this factor weighs heavily in favor of American General owing a duty of reasonable care to its policyholders. Indeed, who could possibly be more foreseeable to an insurance company than its policyholder (SDTC) and its insured (Ms. Wills)?

American General's own vice presidents recognized the foreseeability of danger resulting from the clear conflict of interest inherent in Thornhill serving concurrently as the servicing agent for the Policy and the trustee of the plan that owned the Policy. For example, Mr. Sexton admitted that "**yes, I see a lot of problems with it**, with someone being a trustee and also an agent," while Mr. Lohman stated "it probably wouldn't be a good idea for you to be representing the Wills Corporation and then somehow be affiliated with American General or Gary Thornhill or something like that. **That would be a conflict of interest probably in the most drastic of**

**examples**." (Bellafronto Decl. Exh. B [Sexton Depo.], at 84:10-19, Exh. C [Lohman Depo.], 127:20-128:9, emphasis added). If American General did not use reasonable skill, care and prudence to avoid such a conflict of interest (the issue of breach that will be decided by the trier of fact), there would inevitably be consequential harm to its policyholders. Indeed, the precise type of harm to a policyholder that American General anticipated in drafting its policy is the precise type of harm suffered here. As American General's expert, Mr. Gooch, admitted the specific company policy at issue in this action, prohibiting American General agents from concurrently serving as trustees, was *designed to prevent fraud* and *even potential fraud*. (Bellafronto Decl., Exh. G [Gooch Depo.], at 50:3-12).

**b. The Degree of Certainty that SDTC Suffered Injury and the Closeness of the Connection Between American General's Conduct and the Injury Suffered**

Under the circumstances of this case, the certainty of harm to SDTC, as the policyholder, is great. If American General failed to use reasonable care in establishing and enforcing appropriate company policies and procedures to prevent harm to its policyholders, then the failure to prevent harm that such company policies and procedures address is directly attributable to the failure to use reasonable care. Here, if American General's conduct under the totality of the circumstances was unreasonable, then the harm caused to SDTC as a result of the stolen funds will attributable to American General's failure to use reasonable care.

As explained above, whether or not American General's conduct was consistent with this duty to act reasonably and whether or not it actually caused SDTC's harm will require the trier of fact to determine whether American General acted reasonably.

**c. The Moral Blame Attached to the Defendant's Conduct And The Policy Of Preventing Future Harm**

Here, American General has a moral obligation to take appropriate steps to prevent harm to its policyholders. American General reaps large rewards in the form of premiums paid to it by its policyholders ($3 million in this case). American General is also paid interest on any loans that are taken out under its insurance policies. Because American General obtains these benefits from the sales of its insurance policies, it has a moral obligation to protect the benefits its policyholders

bargained for – the integrity of their insurance policies.

Requiring insurance companies to act reasonably to prevent harm to their policyholders also furthers the policy of preventing avoidable loss. Insurance companies that have a duty to act reasonably toward their policyholders are more likely to enact reasonable policies and procedures to prevent future harm. Indeed, the absence of such a duty would encourage insurers to avoid enacting any preventative measures that would protect against harm to their policyholders. In fact, in the absence of a duty, insurance companies would be able to freely lay blame for harm caused by their agents on elderly policyholders rather than taking measures to prevent such harm in the first place, claiming they are "too big" to prevent harm.[9] In addition, California treats the business of insurance to be "quasi public" in nature, meaning that public policy mandates that insurance companies honor their basic obligations. *Jackson v. Aetna Life & Casualty, Co.*, 93 Cal.App.3d 838, 847 (1979) ("Rules that tend to discourage negligence and/or misconduct are particularly appropriate when applied to quasi public industry."). Therefore, all of these considerations weigh heavily in finding that American General owes a duty to SDTC.

#### d. The Extent Of The Burden To The Defendant And Consequences To The Community Of Imposing A Duty To Exercise Care With Resulting Liability For Breach

Large insurance companies like American General are in the best position to implement and enforce reasonable policies and procedures to prevent harm to their policyholders. These insurance companies already have compliance departments and, as American General points out, legal obligations and regulations to comply with. Any additional burden to enact and enforce reasonable policies and procedures to protect its policyholders from harm is minimal. On the other hand, the community and policyholders will be well-served if American General is required to exercise ordinary care with respect to its policyholders. Therefore, this factor also weighs in favor of finding a duty owed to SDTC in this case.

---

[9] American General argues in footnote 3 of its Motion that Donna Wills is to blame for appointing Thornhill as her trustee, due to some bad investments he made for her. These facts, however, even if true (which Plaintiffs deny) do not relieve American General of a duty of reasonable care to protect the $15.4 million life insurance policy purchased on her life. At best, such facts may be relevant toward the issue of "causation" – not duty.

**e. The Availability, Cost, And Prevalence Of Insurance For The Risk Involved**

There is no insurance available to many policyholders to prevent harm to their insurance policies. The issue in this case is about an insurance policy. Therefore, this factor also weighs in favor of finding that American General owes a duty of reasonable care to SDTC.

**4. American General Owes Duties Of Care Separate And Apart From State Laws And Regulations**

Somewhat naively, American General argues that because the "California insurance industry is heavily regulated" and Plaintiffs cannot cite any specific *state statute or regulation* that it violated, they cannot establish that American General violated any duties toward Plaintiffs. For two reasons, American General is wrong. First, Plaintiffs are not contending that American General committed negligence *per se* based on a violation of any state law or regulation. Therefore, that American General did not violate any state laws or regulations is irrelevant.

Second, Plaintiffs contend that American General was negligent in failing to adhere to the standard of care *in the industry* and *its own policies and procedures*, as set forth in its Compliance Manuals – aimed at maintaining the highest ethical standards in the industry. There is no question that American General's conduct can fall below the standard of care regardless of whether it violates any state laws or regulations. American General's insurance expert, Mr. Gooch, conceded this point during his deposition, recognizing that an insurance company can adopt its own policies and procedures to protect policyholders which may be stricter than any state laws or regulations. (Bellafronto Decl., Exh. G [Gooch Depo.], at 20:15-23:9)

Last, it must be noted that given the nature of American General's status as an insurance company, it owes a heightened duty of good faith and fair dealing to Plaintiffs, including its insured, Donna Wills. *See Neff v. New York Life Ins. Co.*, 30 Cal. 2d 165 (1947) ("[A]n insurer has the duty of exercising good faith in its dealings with the insured"); *Chase v. Blue Cross of California*, 42 Cal.App.4th 1142, 1152 (1996) ("[U]nder this special relationship, an insurer's obligations are greater than those of a party to an ordinary commercial contract."); *Vu v. Prudential Property and Casualty Ins. Co.*, 26 Cal. 4th 1142 (2001) (quoting and citing *Egan v.*

*Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 818 (1979) ("In particular, an insurer is required to 'give at least as much consideration to the welfare of its insured as it gives to its own interests.'").

**F. Plaintiffs' Aiding And Abetting Cause Of Action Is Viable**

American General attacks Plaintiffs' claim for aiding and abetting Thornhill's breaches of fiduciary duty and fraud based on its contention that "American General did not breach any duty to SDTC." For the reasons stated above, American General had a duty to Plaintiffs. Therefore, American General's Motion as to the cause of action for aiding and abetting should be denied.

**G. Plaintiffs' Claim Under The UCL Is Viable**

As an initial matter, American General again improperly raises arguments that have already been dismissed by this Court in its JOP Order. *See* Civ. L.R. 7-9. In particular, the Court has already made the following finding in this case:

> As to the "unfair" prong, American General argues Plaintiffs failed to state a claim because it was authorized by law to honor Thornhill's requests as a properly appointed trustee. This prong, however, is not limited solely to violations at law, but can be based on violations of public policy or other conduct that is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 854 (2002). **Here, Plaintiffs plausibly allege such conduct with facts showing that American General's blind reliance on Thornhill's position as a trustee, despite all the "red flags" known to it, constitutes an unfair business practice.**

(RJN, Exh. 5 [JOP Order], at 7:25-8:4) (emphasis added).

"Business and Professions Code section 17200 *et seq*. prohibits unfair competition, including unlawful, unfair, and fraudulent business acts." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003). "Section 17200 'borrows' violations from other laws by making them independently actionable as unfair competitive practices." *Id*. *citing Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999). "In addition, under section 17200, 'a practice may be deemed unfair even if not specifically proscribed by some other law.'" *Id*. (emphasis added).

For example, a plaintiff may show that a business practice is unfair by showing it violates established public policy (*see Experian Information Solutions, Inc. v. Lifelock, Inc.*, 633 F. Supp. 2d 1104 (C.D. Cal. 2009)) or that it "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," or by "weighing the utility of the defendant's conduct

against the gravity of the harm to the alleged victim." *Walker v. Countrywide Home Loans, Inc.*, 98 Cal.App.4th 1158, 1170 (2002).

Finally, American General's argument that it did not obtain any benefits from the Fraudulent Loans is inaccurate.[10] Interest that will be paid to American General has accrued and continues to accrue on the Fraudulent Loans. (*See* Section III(B), above). Any profits, such as interest on the loans, that American General may have obtained as a result of its unfair business practices are available as a restitutionary disgorgement. *See Korea Supply Co.*, 29 Cal. 4th at 1152 (restitutionary disgorgement of profits permitted under section 17200). Therefore, Plaintiffs' UCL claim is viable and American General's Motion should be denied.

## IV. OBJECTIONS TO EVIDENCE

Unsurprisingly, AG's evidence mirrors its argument – improperly titled at breach or causation, but not duty, the sole issue upon which it purportedly moves. All evidence referenced at 5:19-22, 6:11-7:8, 9:20-10:12, 11:25-12:22, and all other evidence essentially blaming Ms. Wills for the harm that befell her, is wholly irrelevant and prejudicial to a determination of duty, (Fed. R. Evid. 402 and 403) and seems closest to an improper character attack on Ms. Wills. (Fed. R. Evid. 404 and 405.) The e-mail from Ms. Will's advisor quoted at 5:19-22 is also hearsay. (Fed. R. Evid. 802).

## V. CONCLUSION

Based on the foregoing, the Motion should be denied.

Dated: November 12, 2015

HOPKINS & CARLEY
A Law Corporation

By: */s/ Maria S. Bellafronto*
Maria S. Bellafronto
Aleksandr Korzh
Attorneys for Plaintiffs

[10] American General's reliance on *Asghari v. Volkswagon Grp. Of Am.*, Inc., 42 F. Supp. 3d 1306 (C.D. Cal. 2013) is misplaced. In that case, the UCL failed because a vehicle purchased from a third party provided no benefit to Volkswagon. Here, American General has and continues to receive the benefit of continually accruing and compounding interest on the Fraudulent Loans.